IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

DAVID J. LOVEJOY,

     Plaintiff,

v.                          CASE NO. 2:08-cv-0856

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.


## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).  Presently pending before the court are the parties' cross-motions for judgment on the pleadings.

Plaintiff, David J. Lovejoy (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on July 20, 2004, alleging disability as of October 31, 2003, due to back, left knee, left wrist, and left collarbone pain, and inability to read or spell.  (Tr. at 15, 38, 99-101, 122-24, 167-71.)  The claims were

denied initially and upon reconsideration.  (Tr. at 15, 38-42, 47-49.)  On April 13, 2005, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 50.)  The hearing was held on April 11, 2006 and a supplemental hearing was held on August 16, 2006 before the Honorable Valerie A. Bawolek.  (Tr. at 27, 83, 355-66, 367-406.)  By decision dated August 25, 2006, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 15-26.)  The ALJ's decision became the final decision of the Commissioner on May 14, 2008, when the Appeals Council denied Claimant's request for review.  (Tr. at 5-8.)  On June 20, 2008, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§

2

404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists

in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 17.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of residuals of fracture of the clavicle, learning disorder, left knee injury, and borderline intellectual functioning. (Tr. at 17-19.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 19-20.) The ALJ then found that Claimant has a residual functional capacity for medium or light work, reduced by nonexertional limitations. (Tr. at 20-24.) As a result, Claimant cannot return to his past relevant work. (Tr. at 25.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as plant care worker, sandwich maker/non cashier, watchman, and bagger which exist in significant numbers in the national economy. (Tr. at 25-26.) On this basis, benefits were denied. (Tr. at 26.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as

4

> "evidence which a reasoning mind would accept
> as sufficient to support a particular
> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less
> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the Commissioner, not the court, is charged with

resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d

1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not

abdicate their traditional functions; they cannot escape their duty

to scrutinize the record as a whole to determine whether the

conclusions reached are rational." Oppenheim v. Finch, 495 F.2d

396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the

Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was twenty-nine years old at the time of the

administrative hearing. (Tr. at 370.)  Claimant has a ninth grade

education. (Tr. at 371.)  He was retained in the second and sixth

grades, and qualified for special education placement beginning in

the fifth grade.  (Tr. at 180, 191, 242, 371.)  In the past, he

worked for approximately seven years as cutter/chain saw operator

for various tree service companies.  (Tr. at 116, 242, 372.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it briefly below.

Physical Evidence

On October 30, 2000, Claimant was admitted to Thomas Memorial Hospital emergency room ("ER") with a work-related chainsaw injury to his left wrist. Richard Capito, M.D. diagnosed Claimant with a "[c]omplex laceration left wrist 8 cm length with complex repair." (Tr. at 200.)  Claimant was advised to stay off work for two weeks, or to go to light duty if available. (Tr. at 200.)  Dr. Capito noted:

> MUSCULOSKELETAL: There is a macerated, complex laceration to the left anterior wrist.  There is full range of motion of the thumb and all fingers to active and passive motion and stress.  There is full range of motion of the wrist to flexion, extension and ulnar and radial deviation.
> NEUROLOGIC: There is decreased sensation to the thumb to pinprick.  There is sensation present.  The rest of the fingers are normal...The wound is mostly superficial. There did not appear to be any tendon injuries.  I did not see a deep laceration.  There appeared to be no involvement deeper into where the tendon sheaths were or the median nerve... Skin was finally closed with 27 4-0 nylon sutures and patient tolerated procedure well.

(Tr. at 199.)

On November 1, 2000, Claimant was admitted to Thomas Memorial Hospital ER for a suture recheck with complaints of numbness in his left thumb.  Stephen Mohler, M.D. noted

> [n]o fever, no drainage, no redness... Sutures are intact and appear to be healing well to the anterior aspect of the left wrist.  There is no erythema, edema,

6

discoloration or discharge noted. He exhibits full range
of motion with good resistant strength of all digits. He
has full range of motion at the left wrist with slightly
decreased resistance with pain on flexion and extension
of the wrist... he was instructed that he may need
followup with a plastic surgeon if he is still
complaining of numbness or if there would be any
problems. There is no plastic surgeon on call for today,
11/1/2000. Therefore, a plastic surgeon was contacted,
Dr. Portillo, who would be more than happy to see and
evaluate the patient. He is scheduled to see the patient
on Friday, November 3rd at 2:00 p.m... He is to return
ten days from today for wound recheck and removal of the
sutures...He understands the reason that we want him to
follow up with a plastic surgeon, for further evaluation
and management of this wound as he continues to have
numbness.

(Tr. at 202-03.)

On November 10, 2000, Augusto L. Portillo, M.D., performed a

surgical exploration of Claimant's laceration of the left wrist and

repair of the severance of the ulnar nerve.   Dr. Porillo's

operative report states:

The examination disclosed partial severance of the flexor
carpi ulnaris, jagged type, extending into the hypothenar
eminence in the radial side.  This extended all the way
to the dorsum of the wrist, and exploration at the level
was carried out.   The radial ulnari at this level was
intact  and  also  the  branch  of  the  radial  nerve.
Laceration did not extend any deeper than that, and then
the ulnaris longus tendon was intact, and the laceration
on the ulnar side of the wrist contained jagged type of
injury with some partial laceration of the flexor carpi
ulnaris.

(Tr. at 213.)

On December 20, 2000, Dr. Portillo reported that claimant was

prescribed analgesics for post-operative pain management due to

complaints of persistent pain in the operated area.   (Tr. at 211.)

On October 16, 2001, Dr. Portillo reported Claimant

> had attempted to return to work; however, he was unable to carry out his job duties.  He had not sufficiently recovered from the injuries for the job duties he had to carry out.  He was forced to be off work again from 08/26/01 to 09/06/01.  This allowed him to be able to regain his strength and investigate the possibility of job retraining due to difficulties with returning to his former job.  Therefore, please excuse this patient due to temporary total disability for the period of 08/26/01 to 09/06/01.

(Tr. at 210.)

On October 29, 2002, Dr. Portillo reported that Claimant

> has continued to complain of pain in his hand. Regular hand therapy had been successful in giving him more strength and decreasing his numbness.  For that reason, he had been discharged from hand therapy.  Because of his continued complaints, a "Work Conditioning" program may be beneficial for this patient.  At this time, I do not anticipate any further surgery for Mr. Lovejoy nor is there anything surgically that can be done for his subjective complaints.

(Tr. at 209.)

On December 10, 2002, Claimant was scheduled for an introduction into the work conditioning/work hardening program at the Worc Workers Occupational Rehabilitation Center.  Notes indicate:

> Upon his arrival he refused to fill out the paperwork necessary to begin the program unless his case manager was present.  Another staff member and I tried to explain to him that she would not be able to be here on a daily basis and that we would help him with the paperwork.  He would not accept this and said that he didn't see how he would be able to come everyday or do all the things that the program requires.  He assumed he was coming here for physical therapy.

(Tr. at 204.)

On January 8, 2003, Bobbi Jo Chapman of HPT Physical Therapy Specialists wrote to W. Va. Workers Compensation:

> David Lovejoy has been seen at our facility for a total of two visits. He was seen for a follow up visit to his evaluation [December 26, 2002, Tr. at 206-7) to ensure competence with his home exercise program. He is discharged at this time due to his therapy authorization expiring on January 4, 2003 and meeting his goals. Shirley Bradley of RTW phoned our facility on January 7, 2003 to ask that a request be made to extend the therapy authorization. I explained to her that Mr. Lovejoy had no goals at this time because range of motion and strength testing was normal... I recommended to Ms. Bradley that Mr. Lovejoy be placed in a work-conditioning program since he has reached maximum benefit from therapy. Ms. Bradley explained that Mr. Lovejoy has difficulty with reading and writing, which is a requirement of work conditioning at our facility, and would be unable to attend daily. She had no comment to the fact that if Mr. Lovejoy were to return to work, he would have to attend his job daily.

(Tr. at 205.)

On January 17, 2003, Dr. Portillo stated that Claimant had been under his care since November 2000 and that he

> has reached maximum medical improvement and should be referred for an independent medical examination by a doctor chosen by Workers Compensation. A work conditioning program had been advised for Mr. Lovejoy. Unfortunately, he did not complete the therapy because he could not do the tasks requested under the program...All in all, from the beginning of his therapy to the end, he has made great progress. His only subjective complaints is pain... At this point, I do not think there is anything further surgically I can offer to help Mr. Lovejoy. And, from the results of his last therapy session, I do not think another program of hand therapy is needed. Mr. Lovejoy should be referred for an independent medical examination and then possibly rated for permanent injuries.

(Tr. at 208.)

9

On August 7, 2003, Michael S. DeWitt, D.O. evaluated Claimant in regard to his West Virginia Workers' Compensation ("WVWC") work-related left hand and wrist injury. (Tr. at 216-224.)  Dr. DeWitt found that Claimant had reached maximum medical improvement.  He noted that Claimant was not compliant with suggestions that he pursue work hardening and vocational rehabilitation training.  He recommended a whole person impairment of 2% for the injury and found: "It is felt that this claimant is capable of returning to a productive and full work schedule."  (Tr. at 221.)

On March 3, 2004, Claimant underwent a functional capacity evaluation related to his WVWC left hand/wrist injury at Teays Physical Therapy Center.  Doug James, a board certified specialist in Occupational Physical Therapist, determined that Claimant retained the ability to work in the heavy physical demand category ("PDC").  (Tr. at 225-27.)

On July 11, 2004, Claimant was admitted to Thomas Memorial Hospital ER with an injury to his left index digit.  David O. Wright, M. D., the ER physician, noted that Claimant stated he had cut his finger while "drinking some alcohol and... punching some things." (Tr. at 228.)  Dr. Wright's impression was: "Fracture and laceration on the tip of the index digit.  This represents a crush injury and is not consistent with the history the patient provided."  (Tr. at 229.)  Claimant was discharged in satisfactory condition with prescriptions for Keflex and Lortab with

instructions to return in two days for a wound check. (Tr. at 229.)

On October 5, 2004, Rodolfo Gobunsuy, M.D. evaluated Claimant and provided a Disability Determination Evaluation for the West Virginia Disability Determination Service. (Tr. at 246-51.) Dr. Gobunsuy found:

> IMPRESSION: 1. David has chronic sacroiliac strain, left knee strain... He walks steadily, and the range of motion of the lower back is satisfactory. 2. He has history of left wrist injury secondary to chainsaw. The pain may be secondary to nerve irritation. There is no indication of posttraumatic arthritis as the range of motion of the left wrist is the same and normal as that of the right wrist. Likewise, there is no sign of swelling or inflammation in the left wrist. He is right-handed. 3. He has a history of left shoulder injury last October 2003. He had fracture of the left clavicle. He denies pain.

(Tr. at 248.)

On October 5, 2004, Eli Rubenstein, M.D. provided an x-ray report for Dr. Gobunsuy's disability evaluation. Dr. Rubenstein took two views each of Claimant's lumbar spine, left shoulder, and right knee. He reported:

> RIGHT KNEE: The soft tissues appear normal. The articular margins are smooth and regular. The joint space is of normal width. No foreign bodies are seen. There is no evidence of fracture or dislocation. IMPRESSION: Normal knee.
> LEFT SHOULDER: There is an old incompletely healed fracture of the middle third of the shaft of the clavicle with some overriding of fragments. The rest of the shoulder joint appears normal.
> IMPRESSION: Old un-united fracture of the clavicle.
> LUMBAR SPINE: There is normal alignment of the lumbar spine. There is no compression fracture or appendicular defect. The lumbar interspaces are regular and the vertebral bodies are normal in height. The sacroiliac joints are normal.

IMPRESSION: Normal lumbar spine.

(Tr. at 252.)

On November 3, 2004, a State agency medical source completed a Physical Residual Functional Capacity Assessment ("PRFC") and opined that Claimant did not have severe physical limitations. (Tr. at 275-82.)   The evaluator, Uma P. Reddy, M.D. did not check the boxes on the form but made these conclusions: "Well built young male with allegations, not supported by physical evidence to reduce any RFC [residual functional capacity].  His physical exam is okay to perform age appropriate activities.  His pain allegation of knee pain and limitations are not credible as his ADLs [activities of daily living] are not significantly limited and OTC [over the counter] meds help his pain."  (Tr. at 280.)

On February 17, 2005, Cynthia Osborne, D.O. reviewed all the evidence in the file, and Dr. Reddy's November 3, 2004 PRFC assessment, and affirmed Dr. Reddy's conclusions.  (Tr. at 282.)

On September 14, 2005, Gregory A. Elkins, M.D. of Lincoln Primary Care Center, Inc., examined Claimant and completed a West Virginia Department of Health and Human Resources General Physical Adults form.  Dr. Elkins stated:

> Diagnosis Major: Chronic pain left clavicle.  Minor: Chronic pain left wrist, low back, left knee... Worst seems to be from clavicle fracture.  Even with deformity at sight of fracture these injuries usually are not debilitating long term so patient should be seen again by orthopedist.  If there is nothing further then suggest pain management and vocational rehab.

12

(Tr. at 286.)

Medical records dated January 5, 2005 through July 21, 2006 indicate Claimant was treated at Lincoln Primary Care Center approximately twenty times for chronic pain related to his workers' compensation injuries. (Tr. at 287-96, 304-307, 329-31.) Although most of the handwritten notes are illegible, there are two typed reports from Mary Marcussi, M.D. dated May 3, 2005 and January 5, 2005, indicating that she treated Claimant for chronic pain and prescribed Ibuprofen 800 mg and Hydrocodone 5/500 mg. (Tr. at 290, 295.) On December 13, 2005, Dr. Elkins wrote:

> Patient comes in to establish with me as PCP [primary care physician]. I had seen him for DHF physical and had known about his left clavicle fracture that he suffered in 2003... He has an obvious deformity of his clavicle and x-rays confirmed the non-union... At the patient's request we have placed him in a clavicle strap. Although I do not believe this will aid in healing; perhaps provides a little comfort. Continue with the p.r.n. Ibuprofen and Lortab. Referral to Dr. Majestro for consideration of bone graft. I will see him in follow up as needed.

(Tr. at 306-07.)

On May 23, 2006, Kip Beard, M.D. evaluated Claimant in a consultative evaluation for the West Virginia Disability Determination Service. (Tr. at 318-28.) Regarding the physical examination, Dr. Beard noted:

> The claimant is a 29-year-old male that presents today without assistive devices or ambulatory aids. He ambulates normally. He is able to stand unassisted, able to arise from a seat, and step up and down from the examination table without difficulty. The claimant appeared comfortable while seated and supine. The

13

claimant can speak understandably and follow instructions
without difficulty... (Tr. at 320.)
IMPRESSION: 1. Lumbosacral strain with chronic low back
pain.   2.   Left knee injury with possible internal
derangement.  A. Consider chronic mild anterior cruciate
insufficiency.   3.   Left collarbone fracture with non-
union.  4. Left wrist chainsaw laceration injury with
partial laceration of the flexor carpi ulnaris, status
post surgical repair.
SUMMARY: The claimant is a 29-year-old male with chronic
low back pain related to injury.  Examination of the
lower back today revealed complaints of mild pain and
muscular tenderness with preserved motion and no evidence
of radiculopathy.   There is also a history of left
clavicle fracture.  Examination today reveals a superior
displaced clavicle with non-union to the acromion.  There
was some mild pain and tenderness of the shoulder with
some mild motion loss, mild weakness, mildly diminished
grip strength on the left compared to the right but
preserved manipulation.  There is also a history of left
knee injury.  Examination of the knee revealed some mild
pain and tenderness, preserved motion, but a mild degree
of anterior laxity.  The claimant's gait, however, was
nonantalgic.  He did not require ambulatory aids.
Regarding the left wrist laceration, examination does
reveal a well-healed surgical and posttraumatic scarring
with some mild scar prominence.  Range of motion at the
wrist was normal.  There was no weakness at the wrist.
There was some mildly diminished grip strength on the
left compared to the right, perhaps, partially related to
the left wrist injury.

(Tr. at 322-23.)

On May 23, 2006, Dr. Beard also completed a Medical Source
Statement of Ability to Do Work-Related Activities (Physical) form.
He opined that Claimant with his left arm could occasionally lift
25 pounds, frequently lift 20 pounds, had no limitations to
standing, walking, or sitting, and had mild degree of limitation in
pushing and/or pulling due to left shoulder.  Dr. Beard found
Claimant could frequently climb ramps/stairs, balance, kneel,

14

crouch, crawl and stoop; and occasionally climb ladders, rope, and scaffold. (Tr. at 324-25.) He found Claimant was limited in reaching in all directions of the left shoulder, but was otherwise unlimited in manipulative, visual/communicative, and environmental areas. (Tr. at 326-27.)

On May 23, 2006, Eli Rubenstein, M.D. provided an x-ray report to Dr. Beard. The report concluded that two views of the left knee revealed a normal knee: "The soft tissues appear normal. The articular margins are smooth and regular. The joint space is of normal width. No foreign body is seen. There is no evidence of fracture or dislocation." (Tr. at 328.) The report further found a normal left wrist: "The distal portion of the radius and ulna appears normal. There is normal alignment of the carpal bones. The styloid process of the ulna appears intact. The navicular appears normal. No abnormal calcifications or cystic changes are noted about the wrist joint." (Tr. at 328.)

Psychiatric Evidence

On January 2, 1985, Claimant was evaluated by Jean F. Loewenstein, School Psychologist for Lincoln County Schools, at the request of Claimant's mother due to problems with his memory. Ms. Loewenstein reported:

> David's teacher reports that he is a charming, co-operative student. He is still at first grade level in reading, but is making progress. In comparison to his classmates, he is advancing faster than many of them. He is not quite at the middle of first grade skills at this time... David is a small attractive boy. He was

friendly, neat, and co-operative during testing. However, he had difficulty responding when attention was focused on him, or if he had to search for a meaning...

RESULTS:

David with a chronological age of 8-0, achieved a Verbal IQ of 79, a Performance IQ of 85, and a Full Scale IQ of 80 on the WISC-R.  This places him in the low average classification and at the 9th percentile... On the Woodcock-Johnson, David had severe deficits in Reading, Written Language, and Knowledge, and a moderate deficit in Math in comparison to other students.  Knowledge and Reading were weaknesses in achievement in comparison to his ability level.  David was able to decipher no words or find any proofing errors. He understood only three of the first four comprehension sentences, recognized the word "dog" but none beyond that, could spell "bee" but not "seen."  He missed a sign on one math problem he attempted.  On the WRAT, he could add and subtract double digit numbers that did not require regrouping, he knew no word beyond "big," misidentified three (3) letters, and could only spell three (3) words.

DISCUSSION:

David is not functioning quite at his ability level, but his teacher sees him making slow but steady progress forward.  She feels he is going at a reasonable pace for his skills.  His visual motor skills are at age level. In his favor is his hopeful attitude and some of his visualization skills...

RECOMMENDATIONS:

David with a Full Scale IQ of 80 does not qualify for placement in an LD [learning disability] program...

SUMMARY AND CONCLUSIONS:

David Scott Lovejoy is currently functioning in the low average range of intelligence according to the results of this evaluation.

(Tr. at 297-300.)

On October 4, 2004, Joann B. Daily, a Licensed Clinical Psychologist, provided a psychological evaluation of Claimant.  Ms. Daily made the following findings:

ACHIEVEMENT: Results of the WRAT-3 are as follows:

| Achievement Area | Standard Score | Grade Score |
|---|---|---|
| Reading | 52 | 2 |
| Spelling | 50 | 1 |

16

Arithmetic          58                3

WRAT-3 VALIDITY: These scores are valid for the same reasons the IQ scores are valid.

MENTAL STATUS EXAMINATION: Appearance: Jeremy is a nice looking young man, muscular, trim, and neatly dressed in a plaid shirt and jeans. He wore a ball cap and his curly hair was in a short ponytail. Attitude/Behavior: He was personable, polite, cooperative, and calm. Speech was relevant, coherent, and easily understood and Orientation was correct in all spheres. Mood was normal and affect was broad. Thought Process: Stream of thought is within normal limits. Thought Content: There was no evidence of delusions, paranoia, preoccupations, obsessions, or phobias. Perceptual: There was no evidence of illusions, depersonalization, deja vu, or hallucinations. Insight was adequate and judgment was average on the basis of the WAIS-III Comprehensive score of 8. Suicidal Ideation: None. Immediate Memory: Within normal limits based on his immediate recall of all four words. Recent Memory: Within normal limits based on recall of all four words after a thirty-minute delay. Remote Memory: Within normal limits based on recall of details of his personal history. Concentration: Moderately deficient on the basis of the Digit Scan subtest results of 4. Persistence: Within normal limits as demonstrated by test taking behavior. Pace: Within normal limits as observed during the evaluation. Social Functioning During the Evaluation: Within normal limits based on clinical observation of his social interaction with the examiner during the evaluation. Rapport was easily established, eye contact was good, conversation was spontaneous, and he seemed comfortable and calm.

SOCIAL FUNCTIONING, SELF REPORTED: He has several friends with whom he visits back and forth, plays cards, watches television, and goes to cook-outs. He has a close relationship with his parents and siblings. He doesn't go to church or belong to any clubs.

DAILY ACTIVITIES: Jeremy lives in Yawkey, near his parents, brother and his family, and several other relatives and neighbors. He usually gets up around 9 AM and "just wonder what I'm going to do." He feeds his three dogs, eats at his parents' house because the water isn't hooked up in his trailer, and typically walks up to his buddy's house or watches television. He is able to cook and Delilah [girlfriend] and his mother do household chores and laundry. He goes swimming occasionally in the

river and goes hunting "a lot."  He said he would like to
go for a drive "but I can't seem to keep a car going."
He helps with yard work and simple household repairs
"when I'm able."  He likes to listen to rock and roll
music on the radio but doesn't read.  "I can't read
nothing."

DIAGNOSIS:
Axis I    V71.09     No Diagnosis
Axis II   V62.89     Borderline Intellectual Functioning
          315.0      Reading Disorder
          315.1      Mathematics Disorder
          315.2      Disorder of Written Expression
Axis III             Back, knee, and shoulder pain, by
                     self report.

DIAGNOSTIC RATIONALE: The diagnosis of Borderline
Intellectual Functioning is based on his valid FSIQ of
80.  The Reading, Mathematics, and Written Expression
Disorders are based on his extremely low WRAT-3
achievement scores, which are significantly lower than
would be predicted on the basis of his intellectual
ability.
PROGNOSIS: Poor in regard to academic functioning.  Good
otherwise.
CAPABILITY: He would not be considered competent to
manage disability benefits in his own best interest
because of his learning disability.

(Tr. at 243-44.)

On November 15, 2004, a State agency medical source completed
a Psychiatric Review Technique form and opined that a RFC [residual
functional capacity] assessment was necessary based upon Claimant's
12.02 Organic Mental Disorders, borderline intellectual functioning
and learning disability.  (Tr. at 255-56.) The evaluator, Rosemary
L. Smith, Psy. D., found Claimant had a mild degree of limitation
for restriction of activities of daily living and difficulties in
maintaining social functioning, and a moderate degree of limitation
for difficulties in maintaining concentration, persistence, or

18

pace.  She also found no episodes of decompensation.  (Tr. at 265.)
Dr. Smith concluded that the evidence does not establish the
presence of "C" criteria.  (Tr. at 266.)  Dr. Smith noted:

> No history psych treatment of any kind; was in special ed
> starting in 5th grade... ADL's [activities of daily
> living]: indep[endent] self care, takes care of 2 dogs,
> takes out the trash, mows yard, watches TV, visits
> friends, plays cards, lives with his girlfriend.  On the
> ADL form, the claimant reported he could only pay
> attention for 2 minutes.  Not credible.  The evidence at
> the CE [claimant evaluation] does not support this.

(Tr. at 267.)

On November 15, 2004, Dr. Smith completed a Mental Residual
Functional Capacity Assessment of Claimant.  Dr. Smith found that
the evidence supported that Claimant had moderate limitations in
three areas: the ability to understand and remember detailed
instructions; the ability to carry out detailed instructions; and
the ability to maintain attention and concentration for extended
periods.  In the other seventeen areas assessed pertaining to
understanding and memory, sustained concentration and persistence,
social interaction, and adaption, Claimant was found to be not
significantly limited.  (Tr. at 271-73.) Dr. Smith concluded that
Claimant "retain(s) the ability to learn and perform simple,
unskilled work-like activities."  (Tr. at 273.)

On February 17, 2005, James Capage, Ph.D. reviewed all the
evidence in the file and affirmed Dr. Smith's assessment of
November 15, 2004.  (Tr. at 272.)

On November 7, 2005, Mareda L. Reynolds, M.A. completed a

19

psychological evaluation of Claimant upon referral from Claimant's representative.   (Tr. at 308-17.)   Ms. Reynolds described Claimant's presenting problems:

> Mr. Lovejoy presents with a history of fighting that began as a child.  He was suspended in high school for fighting...setting a trash can on fire and also for smoking...Mr. Lovejoy was arrested for a DUI in 1998.  He was arrested for breaking and entering and obstruction of justice in September 2005 when he and a friend attempted to break into a car wash.  Mr. Lovejoy does not accept responsibility for these charges.  He continues to exhibit physically aggressive behavior and is frequently in fights. Mr. Lovejoy does not exhibit remorse for his behavior.  Mr. Lovejoy has an extensive history with alcohol use starting at age 23.  He drinks approximately a six pack of beer per day.  Mr. Lovejoy began smoking marijuana at age 16.  He uses marijuana two to three times a week... Mr. Lovejoy currently lives with his girlfriend in Yawkey, West Virginia.  He receives food stamps and a Medicaid card.  The family has no income... Mr. Lovejoy has never sought treatment for mental health problems.  He has never been prescribed any psychotropic medication.  He has never been hospitalized for mental illness... He has never received substance abuse treatment.

(Tr. at 309-10.)

The results of Ms. Reynolds mental status examination of Claimant were as follows:

> **Appearance:** David Lovejoy is a 28-year old, Caucasian male.  He is 5 fee, 6 inches tall and weighs 150 pounds.  He has brown hair and brown eyes.  He used no adaptive or assistive devices.  He had a tattoo of a skull and cross bones on his left hand.  He had a tattoo of Budweiser label on his forearm.  Grooming and hygiene were adequate on this occasion.  **Attitude/Behavior:** Rapport was slowly established and sufficient for the purpose of this assessment.  He was cooperative and forthcoming with all information requested.  **Social Functioning During Assessment:** Mr. Lovejoy's social interaction during today's evaluation was appropriate.  Eye contact was good.  Length and depth of verbal responses were brief.

**Speech:** He spoke at a normal rate and volume and in simple sentences that were easily understandable. **Orientation:** He was alert and oriented. **Mood:** Objectively, mood ranged from dysphoric to irritable. Affect: Affect was flat. **Thought Processes:** Mr. Lovejoy denied hallucinations, delusions, obsessions or compulsions. Speech was spontaneous, relevant, coherent and clear. There was no evidence of circumstantiality, flight of ideas, tangentiality, word salad or neologisms. **Insight:** Adequate. **Judgment:** Adequate, based on letter test and reported history. **Homicidal/Suicidal Ideation:** Mr. Lovejoy denied homicidal or suicidal ideation at this time. **Immediate Memory:** He was able to recall four of four unrelated items immediately, suggesting that immediate memory is within normal limits. **Recent Memory:** He was able to recall only one of four unrelated items after thirty minutes, suggesting that recent memory is markedly deficient. **Remote Memory:** Adequate, based on the quality of background information he was able to provide. **Concentration/Attention:** The Digit Span subtest of WAIS-III was administered. Mr. Lovejoy obtained a scaled score of 4, which is moderately deficient. **Psychomotor Behavior:** Mr. Lovejoy is ambulatory with effective use of all extremities. He is predominantly right-handed. No tics or tremors were noted. **Persistence/Pace:** Persistence and pace were within normal limits based on clinical observation.

**DAILY ACTIVITIES**

Mr. Lovejoy begins his day at 9:00 a.m. when he arises from bed. He then eats breakfast and brushes his teeth. The rest of his day is spent "piddling around outside and working on my car." Mr. Lovejoy mows the grass. He chops wood. He watches the news and goes to bed at approximately 11:30 p.m. each night. He does no shopping. He cooks approximately twice a day. He does auto care as needed. He does no laundry. He leaves home daily. Hobbies include hunting, racing, and "piddling with the car."... He visits with his family daily.

(Tr. at 311-12.)

The results of Ms. Reynolds' psychological testing of Claimant and her summary/conclusions were as follows:

**Wide Range Achievement Test (WRAT3)**

|            | Standard Score | Grade Equivalent |
|------------|----------------|------------------|
| Reading    | 47             | First Grade      |
| Spelling   | 50             | First Grade      |
| Arithmetic | 53             | Second Grade     |

Validity: The results of Mr. Lovejoy's WRAT3 scores are considered to be valid...His WRAT3 scores are consistent with his educational and vocational background.

**DIAGNOSTIC IMPRESSIONS**

| Axis I:   | 303.90 | Alcohol Dependence |
|-----------|--------|--------------------|
|           | 305.20 | Cannabis Abuse |
| Axis II:  | 301.7  | Antisocial Personality Disorder |
|           | V62.89 | Borderline Intellectual Functioning |
| Axis III: | By Report | S/P Fractured Shoulder (2003) |
| Axis IV:  | Problems with Legal System |  |
| Axis V:   | GAF = 55 (current and highest past year) |  |

**SUMMARY/CONCLUSIONS**

David Lovejoy is a 28-year old, divorced, Caucasian male with a ninth grade education. He is currently unemployed. He was last employed in 2000 by Gillespie Tree Service. Mr. Lovejoy has applied for Social Security Disability benefits. His claim has been denied and he is appealing that decision. Mr. Lovejoy presents with a history of alcohol and cannabis dependence. He also has a history of criminal/antisocial behavior. The results of psychological testing completed today indicate that his intellectual functioning is in the borderline range.

**PROGNOSIS**

Fair

**CAPABILITY**

Mr. Lovejoy should be appointed a payee to assist him to manage any financial benefits he may be awarded.

(Tr. at 313-14.)

On April 5, 2006, Ms. Reynolds completed a "Mental Impairment Questionnaire RFC" form with the following comment: "Substance dependence/abuse not considered in these ratings. Based on report

22

dated 11-11-05."  (Tr. at 317.)  Ms. Reynolds indicated on the form that Claimant was markedly limited in the ability to understand, remember, and carry out detailed instructions; maintain attention for extended periods; work in coordination or proximity to others without being unduly distracted by them; complete a normal workday and workweek without interruption; complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length or rest periods; interact appropriately with the general public; get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes; maintain socially appropriate behavior and to adhere to basis standards of neatness and cleanliness; and respond appropriately to changes in a routine work setting.  Ms. Reynolds further indicated that the claimant was moderately limited in the ability to remember work-like procedures; understand and remember very short and simple instruction; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without supervision; ask simple questions or request assistance; and accept instructions and respond appropriately to criticism from supervisors; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (Tr. at 315-17.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to properly assess Claimant's complaints of pain and resulting limitations and assigned them less than full credibility; and (2) the ALJ erroneously discredited the opinions of treating and examining physicians.  (Pl.'s Br. at 3-12.)

The Commissioner argues that the ALJ's findings are supported by substantial evidence and should be affirmed because the medical evidence supports the ALJ's conclusion that Claimant could perform medium and light work.  (Def.'s Br. at 10-14.)

Credibility

Claimant first asserts that the ALJ erred in assigning less than full credibility to Claimant's complaints of physical pain and resulting limitations, and his psychological impairments, including learning disabilities. (P. Br. At 3-8.)   Specifically, Claimant argues:

> The ALJ erred as a matter of law in evaluating Mr. Lovejoy's subjective complaints in failing to apply the regulatory factors set forth in SSR 96-7p and 20 C.F.R. §404.1529 and in making a conclusory credibility finding in violation of SSR 96-7p... In her decision, ALJ Bawolek discredited Mr. Lovejoy's allegations of pain and limitations because he was "able to take out trash and mow the lawn."... In the instant case, the ALJ ignored treating and examining physician records and Mr. Lovejoy's testimony to conclude that Mr. Lovejoy is not disabled.  He is clearly disabled and the record supports his allegations of pain and limitations... The Decision does not accurately address Mr. Lovejoy's impairments and the resulting limitations.  It completely discounts his

physician's opinions concerning his pain and limitations
(Tr. 205-02, 304-307, 308-317), his Personal Pain
Questionnaire (Tr. at 140-144, and his psychological
evaluation report, Function Report, and education records
concluding significant mental limitations (Tr. 132-139,
182-194, 308-317). The Decision further states that Mr.
Lovejoy's activities of daily living do not support a
finding of disabled (Tr. 13-31)... whether Mr. Lovejoy
does or does not engage in the normal activities of daily
living is not in itself substantial evidence of one being
disabled. The record reflects his inability to sustain
normal activities on a sustained basis... He takes pain
medications on a daily basis and for six weeks at a time,
at least four times per year the condition so worsens as
to totally incapacitate him (Tr. 84-88).

(Pl.'s Br. at 4-7.)

Social Security Ruling 96-7p clarifies when the evaluation of
symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929
requires a finding about the credibility of an individual's
statements about pain or other symptom(s) and its functional
effects; explains the factors to be considered in assessing the
credibility of the individual's statements about symptoms; and
states the importance of explaining the reasons for the finding
about the credibility of the individual's statements. The Ruling
further directs that factors in evaluating the credibility of an
individual's statements about pain or other symptoms and about the
effect the symptoms have on his or her ability to function must be
based on a consideration of all of the evidence in the case record.
This includes, but is not limited to:

    - The medical signs and laboratory findings;

    - Diagnosis, prognosis, and other medical opinions provided

25

by treating or examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

In his decision, the ALJ considered the evidence of record related to Claimant's impairments and concluded that while Claimant's residuals of fracture of the clavicle, left knee injury, learning disorder and borderline intellectual functioning were severe impairments, he retained the functional capacity to perform a range of light and medium work, such as a plant care worker, sandwich maker/non cashier, watchman, and bagger. (Tr. at 17-26.) He reasoned that Claimant's chronic pain complaints were inconsistent with the objective medical evidence and the daily activities reported by Claimant. (Tr. at 21.)

The ALJ found:

The claimant's residuals of fracture of the clavicle are evaluated under Sections 1.02(B) and 1.07 of the Listing of Impairments. There is no evidence that the claimant has inability to perform fine and gross movements effectively or that functional use of the extremity was not restored or expected to be restored within 12 months of onset as required to meet or equal either listing.

The claimant's left knee is evaluated under Section 1.02(A) of the Listing of Impairments. However, there is no evidence of inability to ambulate effectively as required to meet or equal the listing. In fact, the claimant was found to ambulate normally during multiple examinations of record.

The claimant's learning disorder and borderline intellectual functioning are evaluated under Sections 12.02 and 12.05 of the Listing of Impairments. However, the claimant does not have IQ scores at the level to meet or equal a listing. Concerning the "Part B" criteria the claimant has mild restriction of activities of daily living. He reported on a questionnaire that he has no problems taking care of his personal care. In fact, he indicated that he took care of his girlfriend and two dogs. The claimant noted that there was nothing that he could do before his illnesses, injuries, or condition, that he could not do now. He indicated that he took out trash and mowed the yard (Exhibit 4E). The claimant has mild difficulties maintaining social functioning. He reported to Ms. Reynolds that he leaves home daily. The claimant indicated his hobbies included hunting, racing, and "piddling with the car". He noted that he visited with his family daily. Ms. Reynolds indicated that the claimant's social interaction was appropriate (Exhibit 19F)... The testing of record indicates that he claimant had moderately deficient concentration, but normal persistence and pace (Exhibits 10F, 19F). There is no evidence that the claimant has experienced an episode of decompensation since his alleged onset date...

The claimant testified at the first hearing held on April 11, 2006, that he cannot remember if he quit school in the eighth, ninth, or tenth grade. He indicated that he was in special classes due to his learning disorder. The claimant alleged that he forgets things two to three times a day. He noted that he takes Hydrocodone and Lortab for pain. The claimant testified that he sometimes drinks a "six pack" to help him sleep. He indicated that he has pain in his left shoulder and has problems lifting his hands above his head. The claimant alleged that on a scale of 0-10, with 10 being the worst, he has pain on the average of six. He noted that he can only sit 30 minutes to one hour before he has to get up due to pain. The claimant testified that he only uses marijuana occasionally to calm down.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

The claimant alleges experiencing chronic pain on an average of six.  However, the claimant's complaints of pain and extreme limitations are totally inconsistent with essentially normal activities of daily living he described.  For example, during an evaluation arranged by his representative, the claimant reported to Ms. Reynolds that he spent his day "piddling around outside" and working on his car.  In fact, the claimant indicated that he mowed the grass and chopped wood.  He noted that he did auto care as needed.  The claimant reported that his hobbies included hunting, racing, and "piddling with the car".  He indicated that he visited with his family daily (Exhibit 19F).  These activities as reported by the claimant do not support his testimony of chronic pain and in fact indicate that he is not credible.

In regard to the lack of objective findings supporting the claimant's testimony of extreme pain and limitations it is noted that he walked steadily without limp and antalgia during a consultative examination on October 5. 2004, by Dr. Gobunsuy.  He indicated that the claimant was able to walk on heels, toes, walk heel-to-toe and squat without difficulty...

Also during a consultative medical examination performed subsequent to the first hearing on May 23, 2006, Dr. Beard noted that the claimant ambulated normally.  He indicated that the claimant was able to stand unassisted, able to arise from a seat, and step up and down from the examination table without difficulty... an x-ray of the claimant's left knee was normal (Exhibit 20F).

Concerning the claimant's history of left shoulder injury the record includes an x-ray report dated October 5, 2004, that showed an impression of old ununited fracture of the clavicle (Exhibit 11F, p7).  However, Dr. Gobunsuy noted on examination that the claimant denied pain in the left shoulder and was right-handed (Exhibit 11F, p3). Also, Mary Marcuzzi, M.D. noted during an examination on January 5, 2005, that the claimant's range of motion of head and neck was very good.  Dr. Marcuzzi indicated the

28

claimant could fully rotate bilaterally and could bring his chin and shoulder together bilaterally (Exhibit 16F, p9)... Essentially mild findings described during the examinations discussed above, do not support the claimant's allegations, and in fact support the conclusion that he is not credible.

E. R. Chillag, M.D. testified at the first hearing held on April 11, 2006, that the claimant has no condition that meets or equals a listing. Dr. Chillag noted that the claimant has a history of some injuries, including one to his left wrist and when a nerve to a finger was cut and repaired with reasonably good results. Dr. Chillag testified that the claimant had a fracture to the left collarbone and it is ununited. Dr. Chillag opined that this can cause the claimant pain, especially if he moves his left shoulder "a lot". However, Dr. Chillag further opined that the claimant can perform medium exertion. He indicated that the claimant is taking too many narcotics in that he takes two Lortab a day. Dr. Chillag testified that the claimant can climb ladders and scaffolds. He opined that the claimant has no limitation in the other postural activities. The undersigned gives great weight to the opinion of Dr. Chillag that the claimant can perform medium exertion as it is well supported by the evidence of record.

The record also includes the results of a functional capacity evaluation from Teays Physical Therapy Center dated March 3, 2004. The summary revealed the claimant could perform at the heavy physical demand classification. It is noted that the claimant's testing was valid (Exhibit 7F). The undersigned rejects the opinion of this evaluation from a physical therapy center that the claimant can perform heavy exertion. As noted below, the undersigned gives great weight to the opinion of the medical expert, Dr. Chillag, that the claimant is limited to medium work, as it is well supported by the objective findings of record.

(Tr. at 19-22.)

Also, a review of the ALJ's decision shows that he fully complied with the requirements of Social Security Ruling 96-8p that

[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an

individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

SSR 96-8p, 1996 WL 362207, *34477 (1996).

The ALJ found:

Concerning the non-severe impairments it is noted that the claimant alleges chronic back pain. Although Dr. Gobunsuy did diagnose chronic sacroiliac strain during a consultative evaluation on October 5, 2004, he also noted that the claimant's range of motion of the lower back was satisfactory...Dr. Beard reported during a consultative evaluation on May 23, 2006, that the claimant had only mild complaints of pain on motion testing of the lumbar spine. In fact, Dr. Beard noted that the claimant's range of motion was normal and straight leg raising testing was normal (Exhibit 20F). Therefore the undersigned finds that the evidence establishes that the claimant has no severe back impairment. The normal impressions on the claimant's lumbar spine x-rays, and lack of objective findings during numerous multiple examinations, are consistent with the opinion that the claimant has no severe back impairment.

The claimant also alleges chronic left wrist pain. The evidence indicates that the claimant underwent exploration of laceration of the left wrist on November 10, 2000, well before his alleged onset date... During a consultative examination on October 5, 2004, Dr. Gobunsuy noted that the claimant had history of left wrist injury, but there was no indication of posttraumatic arthritis. In fact, Dr. Gobunsuy indicated that the range of motion of the claimant's left wrist was normal and the same as the right wrist...(Exhibit 11F. Finally it is noted that subsequent to the first hearing Dr. Beard indicated during a consultative evaluation on May 23, 2006, that the claimant's range of motion of the left wrist was normal... An x-ray of the claimant's left wrist on May

> 23, 2006, was normal (Exhibit 20F).   Therefore, the
> evidence reveals that the claimant has no severe
> impairment of the left wrist.
>
> Concerning the claimant's acknowledged use of marijuana
> and alcohol it is noted that he reported to Ms. Daley on
> October 4, 2004, that he drinks only on weekends.   He
> noted that he also occasionally smoked marijuana (Exhibit
> 10F, p2).   The claimant testified at the first hearing
> that he sometimes drinks a "six pack" to help him sleep.
> He also indicated that he occasionally smoked marijuana
> to calm himself down.   However, evidence in the record
> establishes that the claimant's drug and/or alcohol abuse
> cause no more than a slight abnormality or a combination
> of slight abnormalities and has no more than a minimal
> effect on his ability to work.   Therefore the undersigned
> finds that the claimant's drug and/or alcohol abuse is
> not a severe impairment.

(Tr. at 18-19.)

While Claimant disagrees with the ALJ's findings cited above,
the court has reviewed them and Claimant's testimony at the
administrative hearing and finds that the ALJ's credibility
findings are supported by substantial evidence.   The conclusions
drawn by the ALJ are reasonable.   Additionally, Claimant's largely
conservative treatment and the lack of objective medical evidence
supporting his subjective complaints, along with the other factors
identified in SSR 96-7p, all counsel in favor of a finding that
Claimant's subjective complaints are not entirely credible.

The undersigned proposes that the presiding District Judge
find that the ALJ properly weighed Claimant's subjective complaints
of pain and properly assessed Claimant's credibility and the
combination of his impairments, in keeping with the applicable
regulations, case law, and social security ruling ("SSR") and that

his findings are supported by substantial evidence.  20 C.F.R. §
404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig
v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

Weighing Medical Opinions

     Claimant next argues the ALJ erred in weighing the opinions of
treating  and  examining  physicians.    (Pl.'s  Br.  at  8-12.)
Specifically, Claimant takes issue with the ALJ's assessment of the
opinion  of  Mareda  L.  Reynolds,  a  licensed  psychologist  who
performed an evaluation of Claimant on November 7, 2005, and "fails
to pose a complete hypothetical question to the VE [vocational
expert] as it neglected Mr. Lovejoy's psychological limitations set
forth by Psychologist Mareda Reynolds (Tr. at 308-17), specifically
9 moderate limitations and 10 marked limitations in work related
areas of function." (Pl.'s Br. at 8.)  Also, Claimant asserts that
the  ALJ  discounted  the  hearing  testimony  that  Claimant  "is
incapable  of  sustaining  any  gainful  activity  (Tr.  402)  and
testimony and  evidence supporting the psychological expert, Dr.
Linton's hearing testimony that Mr. Lovejoy is only 1 point away
from meeting Listing 12.05C." (Pl.'s Br. at 8, Tr. at 362.)
Claimant concludes that the ALJ erred through failure "to consider
the opinions of both treating and examining physicians who found
Mr. Lovejoy incapable of sustaining employment."  (Pl.'s Br. at
11.)

     Under the regulations, more weight must be given to treating

sources than to non-examining sources (20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2006)).    Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. § 416.927(d) (2006). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."   Id. § 416.927(d)(2).

Under § 416.927(d)(1), more weight is given to an examiner than to a non-examiner.  Section 416.927(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources).  Section 416.927(d)(2)(I) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under § 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion.  Sections 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given),

33

and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

In this case, Claimant disputes the ALJ's finding that Ms. Reynolds' conclusions regarding Claimant's limitations were inconsistent with the summary of her evaluation of the claimant. (Pl.'s Br. at 8-12, Tr. at 24.)   Claimant appears to assert that Ms. Reynolds was a treating psychologist but the record is clear that Ms. Reynolds provided only a consultative evaluation.  (Tr. at 308-17.)   The ALJ articulated the following reasons for rejecting Ms. Reynolds' opinion regarding Claimant's functional limitations:

> The claimant alleges that he has memory problems.  While it is noted that the claimant has valid IQ testing that reveals he functions in at the borderline intellectual range, he has no evidence of any other psychological impairment.  In fact, during a psychological evaluation arranged by his representative on November 7, 2005, the claimant reported to Ms. Reynolds that he had never sought treatment for mental health problems.   The claimant also noted that he had never been prescribed any psychotropic medication or been hospitalized for mental illness (Exhibit 19F)... On April 5, 2006, Ms. Reynolds completed a mental assessment form in which she indicated that she evaluated the claimant's limitations without considering substance dependance or abuse in the ratings. She found that the claimant was markedly limited in the ability to understand, remember, and carry out detailed instructions; maintain attention for extended periods; work in coordination or proximity to others without being unduly distracted by them; complete a normal workday and workweek without interruption; complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length or rest periods; interact appropriately with the general public; get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes; maintain socially appropriate behavior and to adhere to basis standards of neatness and cleanliness; and respond

34

appropriately to changes in a routine work setting. Ms. Reynolds indicated that the claimant was moderately limited in the ability to remember work-like procedures; understand and remember very short and simple instruction; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without supervision; ask simple questions or request assistance; and accept instructions and respond appropriately to criticism from supervisors; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others (Exhibit 19F). The undersigned totally rejects the limitations by Ms. Reynolds as they are extreme and inconsistent with the summary of her evaluation of the claimant. During her evaluation of the claimant Ms. Reynolds indicated that the claimant had appropriate social interactions, but on the assessment she found numerous extreme limitations in this area. The limitations are not supported by the evidence or the testimony of Dr. Linton, the psychological medical expert.

Dr. Linton testified at the supplemental hearing held on August 16, 2006, that there is no psychological problem claimed by the claimant or noted in the record except alcohol and cannabis abuse. He noted that the claimant's latest verbal IQ score is one or two points away from 12.05(C), but was higher during earlier testing. Dr. Linton testified that other than intellectual functioning there is no other mental health problem. He noted that he does not know why Ms. Reynolds found the claimant had marked limitations in maintaining attention for extended periods. Dr. Linton opined that the record does not support marked limitations in this area. He also indicated that he did not understand why Ms. Reynolds found the claimant would be unduly distracted by others. Dr. Linton noted that he did not know what psychologically based symptoms would disrupt the claimant's workday as indicated by Ms. Reynolds. He testified that he did not understand why Ms. Reynolds found the claimant had marked limitations in interacting with the public and basic standards of neatness and cleanliness. The undersigned gives great weight to the testimony of Dr. Linton that the claimant's only psychological problem is his borderline intellectual functioning. Also as noted by Dr. Linton, the limitations indicated by Ms. Reynolds are too severe and

not supported by the record. In fact, they are not even supported by her own summary of the evaluation of the claimant...

The State agency medical consultant who reviewed the record on November 15, 2004, completed a psychiatric review technique form in which he evaluated the claimant's impairments of borderline intellectual functioning and learning disorder under Section 12.02 of the Listing of Impairments... A second State agency medical consultant reviewed the record on February 17, 2005, and affirmed the findings on the psychiatric review technique form (Exhibit 12F). The undersigned gives great weight to the State agency opinion that the claimant has severe impairments of learning disorder and borderline intellectual functioning, but has only moderate limitation in maintaining concentration, persistence, or pace. This opinion is well supported by the testimony of Dr. Linton, the medical expert, and the evidence of record.

(Tr. at 23-24.)

The ALJ's rationale comports with the applicable case law and regulations, discussed above. Ms. Reynolds was a one-time examiner, not a treating source. However, even assuming arguendo Ms. Reynolds was considered a treating source, her opinion would not warrant controlling weight because it is not consistent with her own earlier evaluation report. The court proposes that the District Judge find that the hypothetical question posed by the ALJ included those limitations that were supported by substantial evidence of record. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)(While questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record.). The ALJ posed a proper hypothetical question to the vocational

expert because it was unnecessary to include the limitations set forth by Ms. Reynolds in the April 5, 2006 form, as those limitations were inconsistent with her own earlier findings of November 7, 2005.   It is further noted that Claimant's representative had an opportunity to pose additional hypotheticals to the vocational expert, and did so. (Tr. at 401-405.)   The vocational expert responded that if all those limitations were included, "I don't think a person could work." (Tr. at 402.)   The record clearly shows that the ALJ was present and participating in the re-examination of the vocational expert. (Tr. at 401-05.) Accordingly, the court proposes that the presiding District Judge find that substantial evidence supports the ALJ's weighing of Ms. Reynolds' opinion, as well as that of Dr. Linton and the other treating and evaluating physicians.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge AFFIRM the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable John T. Copenhaver.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service)

from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

_July 23, 2009_
Date

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge

38